By the Court. Sandford, J.
The plaintiff contends, that the contract made with him for exchanging his bonds for the *49 stock of the company, never was binding upon the latter, and. therefore his title to the bonds was unaffected by the exchange. His first point in support of this position, is that the directors of the company had no authority to issue capital stock, and receive in payment the bonds or indebtedness of the company. On this subject, we entertain no doubt of the authority of the directors, to issue the unsubscribed stock, whenever and as often as opportunities were presented. The act of 1833, contains an express grant of power to this effect, without restriction as to time, place, previous notice, or the form of the subscription. The directors were entrusted with the duty of forwarding the construction of this rail road, which, as the course of legislation respecting it shows, has been deemed by the state government, a highly important public enterprise. And to enable them to accomplish it, the statutes relative to this corporation, instead of the usual pre-requisite in stock corporations, of a full subscription of the capital, authorized it to proceed when one-tenth part of its intended capital was taken, and to obtain further subscriptions from time to time, until a sufficient sum should be procured to complete the work. Indeed, it seems the commissioners appointed to open the books, by the original charter, were unrestricted as to the time and manner of obtaining subscriptions, after offering the stock to the public for three days, under an advertisement.
As to the form of the subscription, no particular form is necessary. The object of a subscription being, to furnish evidence of the liability of the subscriber to pay up his shares, and also to show who have become the shareholders of a corporation ; it becomes a mere ceremony, where the new stockholder on receiving his shares, pays them up in full, and takes his certificate, which has been-previously entered in the stock ledger. This may not, perhaps, dispense with the observance of the ceremony, although it be useless; but in this case, there was a subscription, sufficiently formal, in the plaintiff’s receipt for the shares, written in the margin of the scrip book.
The mode of payment for the stock in question, is also made an objection to the authority of the directors ; but as we think, without any good cause. We doubt the propriety of the plain *50 tiff’s finding fault with his shares, because he paid for them in the debt of the company, instead of paying cash. Nor do we assent to the argument, that the company, under a new direction, could have repudiated the shares, whatever might have been its remedy against the plaintiff for the amount payable to make them full shares, assuming that payment in bonds was unauthorized.
But to return to the transaction before us, we think it entirely free from objection. The plaintiff was the holder of the company’s bonds, and entitled to receive payment of their full amount, in cash, when they matured. If the company had procured some other person to subscribe for sixty shares of stock, and to pay them up in full; the six thousand dollars thus obtained, could do no more than pay the plaintiff’s bonds. Thus, it made no possible difference to the company, or to the prior stockholders, whether the plaintiff took the shares and cancelled the bonds, or whether another party took the same shares, paid the amount, and the company with that sum, discharged the bonds. On the assumption that the stock had some value, and the debts would be paid, it was all one to the company; and if the stock were worth nothing, no one but the plaintiff could be injured by the exchange. It is to be observed, that the bonds in question were not issued to the plaintiff, on an agreement to receive them for stock, or for an amount or consideration enhanced by the circumstance that they would be paid in stock, and not in money.
We are satisfied that the exchange of the stock for the bonds, was valid, so far as it is to be deemed the act of the directors of the company.
But the plaintiff next insists, that the directors could not delegate the power to receive subscriptions to the capital stock; that they never authorized the exchange in question; and that the treasurer and secretary had no authority from them to make the exchange; which therefore, was an invalid contract, not binding on either party, when the plaintiff demanded back his bonds.
First, as to the delegation of authority. The directors could not always be in session, either as a board or by committees. *51 They necessarily acted by agents,, and we perceive no good reason why the power to receive subscriptions to the capital stock, could not be conferred on one or more agents, with as much propriety as the far more important power of contracting for labor, materials, and the like, in the construction of the road.
Then, as to the authority conferred on the treasurer and secretary. We have no doubt that the resolution of November 8th, 1844, authorized those officers to issue stock for such bonds as the plaintiff held. The spirit of the resolution, and the object in view, are sufficient to show that the resolution was not limited in its effect to propositions which had already been made. But there is a difficulty in sustaining this exchange under the resolution of November, 1844, in consequence of the repealing resolution of December 1st, 1845. We are unable to read the latter, so as to restrict its operation to the mere allowance of interest not yet earned on the certificates of the company. It is in its plain terms, a repeal of the entire resolution of November 8th, 1844. At the same time, there is no room on the facts, to doubt that the intention of the directors was simply to prohibit the issue of stock for the unearned interest on the bonds. In addition to the positive testimony of the treasurer who brought in the repealing resolution, and the practice of the company in accordance with his statement; there is the circumstance that the conversion of the company’s actual debt into stock, remained as important and desirable as it ever had been; andlhe recent cash subscription of over three millions under the act of 1845, would account for the change intended to be accomplished by the resolution of December 1st, 1845, as it would not be just to those new stockholders to issue stock for debts with the addition of three years of unearned interest. Nevertheless, we feel great difficulty in construing the repealing resolution by clear proof its object and intention, when its language is as clearly the other way; and we will waive the point.
The testimony shows, that for at least three distinct classes of indebtedness, stock had been issued for periods of from one year to two years and a half, by several officers of tb company, *52 under express authority from the directors. Such authority existed in the treasurer and secretary, as to the class to which the bonds in question belonged, from November 8th, 1844, to December 1st, 1845, if no longer. Those two officers had for two years and a half, been in the practice of issuing stock, in the manner that was pursued in this instance, without any express power, so far as it appeared, except the resolution of November 8th, 1844; and the treasurer had in like manner from time to time, made agreements with the-New York creditors to issue stock for their debts. In this respect, the treasurer seems to have exercised the authority which was conferred on the executive committee by the directors in May, 1843.
These issues of stock for indebtedness, by the treasurer and secretary, had extended to about six hundred shares. The president and treasurer were also expressly authorized in respect of a class of seven per cent, certificates, by a resolution of October 7th, 1845. The president, treasurer, and secretary, were the principal officers, and in their respective spheres, the agents of the company. The acts of these several officers in thus issuing stock for indebtedness, had never been disclaimed, or questioned, by the directors or the company. They had proceeded so long, and to so great an extent, that ignorance on the part of the company could not be asserted, and silence and acquiescence had ripened into indisputable authority.
Under such circumstances, the exchange in question was negotiated and' agreed upon, between the plaintiff on the one hand, and the treasurer and secretary, acting in behalf of the company, on the other, and was approved by the president; the contract was executed, and the plaintiff received scrip for his shares, with the regular signatures and authentication of the president and secretary, and the proper entries in the company’s books.
We are convinced, that the company could never have set aside this transaction, on any pretence of want of authority in these their three principal officers. The facts we have stated, would be perfectly conclusive against any such attempt on the part of the company. The implied authority, from the course of business, and from similar acts done without challenge or *53 disaffirmance, is as potent as an express resolution of the board of directors. The contract was, therefore, valid and binding upon the company. Was it any less valid against the plaintiff? It is contended, that he was not bound, because there was no express authority given to those officers, and the plaintiff cannot be held, upon one implied from previous acts, which were not authorized at the time, and which could at any time have been repudiated. That the company cannot bind him upon an apparent authority in its officers to contract, when in fact there was no real authority.
We think there is no difficulty on this subject. The practical good sense of the matter is this. The plaintiff dealt with the three principal officers of the company, without inquiring into their powers; willing to act, and acting, on their apparent authority to issue stock for debts. If he had inquired into their authority, and found it to be implied from usage and acquiescence merply, and had chosen to proceed with the exchange, he could have held the company bound. He cannot now, because he omitted to inquire, withdraw from the contract, on finding that they had such implied authority, and no other. In any contested point of authority on the part of the company, it would be incumbent on him to prove its existence; and proving a power implied from acts, would be as effective as the most positive authority in writing. The same proof must be valid against him; with no difference, save that more ■ full proof would be required from the company than from him, to establish the implied power. The contract for the exchange of the bonds for the stock, was therefore valid, and bound both parties.
The next questions arise upon the transfer book of consolidated stock, and the plaintiff claims that the contract was rescinded by the company’s direction on the morning of January 3d, not to permit transfers of this species of stock on the consolidated transfer book.
This was claimed at the trial, upon the ground, among others, that the defendants had been guilty of a constructive fraud in the .transaction. The question of fraud was submitted to the jury, and they have negatived it by their verdict. As to the misrepresentations said to have been made by the officers of the *54 company, in ignorance, and not with any fraudulent intent 5 they relate first, to their authority to issue the stock, and second, to their assurance that it might be transferred on the book of consolidated stock. As to the first, we have stated our conclusion that they had authority. The assurance as to the transfer book, was not made by either of the officers having any authority, real or apparent, or with any one who contracted with the plaintiff. But if it had been made by the latter, there was no misrepresentation. When the statement was made, such stock was permitted to be transferred on the consolidated book. If the plaintiff had any right to rely upon their promise that it should continue to be so transferable, it at most, formed part of the contract between the parties, for a breach of which the defendants would be liable in damages. Their omission to apprise him of their determination to use another transfer book for this species of stock, may also have been the ground of an action; if it prevented him from re-exchanging his stock for the bonds, within the time stipulated for that purpose. We do not undertake to decide whether the change in the transfer book made any difference in the value of the stock.
In every aspect of the case, we are bound to say, that the contract for the exchange, was a valid, executed contract, on the second day of January; unaffected by any fraud, actual or constructive. When the defendants issued and delivered to the plaintiff scrip for sixty shares of stock, they performed it, so far as it was then capable of execution. If the defendants failed to fulfil such of its obligations as were to be subsequently performed, the plaintiff should have sued them for the breach. If they so conducted, that they prevented him from availing himself of the provision for a re-exchange, and he was thereby injured, he had his appropriate remedy, in an action on the case for damages. But neither of these events avoided the original contract, or warranted the plaintiff in treating it as rescinded.
We have discussed these points, as if the understanding relative to the transfer book, were to be deemed a valid and subsisting portion of the agreement. The defendants insist, that as the agreement was reduced to writing in the issue of the shares *55 and the stipulation for re-exchange, no evidence of the alleged understanding is admissible. We do not intend by our decision, to sanction the introduction of the testimony, or to pass upon the question.
Upon.the whole, we are satisfied that the ruling of the judge at the trial, was correct, and that the action cannot be maintained.
Motion for a new trial denied.